ANDOVER REALTY, INC., et al., Respondents, v WESTERN
ELECTRIC COMPANY, INCORPORATED, Appellant.

First Department, March 1, 1984

APPEARANCES OF COUNSEL

*Martin J. McHugh* of counsel (*Mark C. Kelly, Alan R.
Chesler* and *Marguerite B. Filson* with him on the brief;
*McHugh, Leonard & O'Conor,* attorneys), for appellant.

*Edward Jaffe* of counsel (*Alicia M. Gany* with him on the
brief; *Jaffe & Segal,* attorneys), for respondents.

OPINION OF THE COURT

Ross, J.

Western Electric Company, Incorporated's (Western)
New York City office sent a form letter, dated March 4,
1980, to 28 real estate brokers. In this letter Western
advised these brokers that it was seeking a buyer for a
portion of its Kearny, New Jersey, facility. The letter, in
pertinent part, read:

"[This] property, known as the South Tract, consists of
approximately 1,200,000 square feet (net useable) in com-
bination of single and multiple story structures on approxi-
mately 40 acres of land.

"The property is being offered at $5,000,000 and it is our desire that this be all cash. We will pay a commission of 5% at the closing of any sale *accepted by our Board of Directors.*

"We are putting the property on the market through open listings and will protect your commission with a properly registered client brought in by you. In order to be registered, a client must be personally escorted through the property by you or a representative of your company and have his name recorded with Western Electric. The client must state in writing that you are his broker in this transaction, and you must execute one of our mini-listing agreements [brokerage agreement] attached hereto." (Emphasis supplied.)

The attached brokerage agreement form contained the following pertinent paragraphs:

"This Agreement defines the terms under which Western Electric Company, Incorporated (Western) will pay _____ (Broker) a brokerage commission for sale of a portion of Western's property at 100 Central Avenue, Kearny, New Jersey * * *

"3. Western anticipates realizing not less than $4,500,000 from the sale of said property. Western expressly reserves the right to approve or reject any proposal from Principal that is presented to it by Broker without incurring any liability by Western to Broker.

"4. No commission shall be deemed earned by Broker except only when, as and if title actually closes with Principal pursuant to a contract entered into during the term of this Agreement."

Two lines are set forth at the foot of this brokerage agreement for the signatures of the broker and Western.

Twenty-five of the brokers solicited were located in the State of New Jersey and the remaining three were located in the State of New York.

One of the New Jersey brokers that received the subject letter was:

"MR. LEONARD GERO
"Andover Realty of New Jersey, Inc.
"245 Moonachie Road
"Moonachie, New Jersey 07074"

When Leonard Gero (Gero) received this letter he was the president, director and stockholder of Andover Realty of New Jersey, Inc. (Andover-New Jersey); and, Gero also held the same titles in a New York corporation known as Andover Realty, Inc. (Andover-New York). Both Andover-New Jersey and Andover-New York were engaged in the real estate brokerage business, and were respectively licensed in New Jersey and New York. Frequently, Andover-New Jersey and Andover-New York worked together to obtain a purchaser.

According to Gero he deliberately did not sign the brokerage agreement because "[t]he agreement did not meet the criteria that we usually use to sign agreements". Despite not complying with Western's condition of executing a brokerage agreement, Gero undertook to find a buyer for this property. Thus, Gero sent a copy of Western's letter to Andover-New York.

By a letter, dated April 8, 1980, which appears on the stationery of Andover-New Jersey and which is signed by Gero as president of Andover-New Jersey, Gero informed Remo Grimaldi (Grimaldi), who was then department chief of corporate realty of Western, that he was submitting a proposal from Ray Greenwald (Greenwald) and Mayer Reiss (Reiss) to purchase the property. It is undisputed that Gero hand delivered this letter to Grimaldi at Western's New York City office, located at 222 Broadway.

Examination of the Greenwald and Reiss proposal reveals that it was in substance a counteroffer to Western, since it contained terms significantly different than the ones set forth by Western in the March 4 letter, and the brokerage agreement, cited *supra*. For example, the proposal offered $3,250,000 in cash for the property; sought a 6% commission for the broker; and made certain demands about heating the property. Western rejected this proposal.

Subsequently, Gero sent another letter, dated April 30, 1980, to Grimaldi and this letter contained a revised proposal from Greenwald and Reiss as nominees of the Realex

Capital Corporation (Realex). Once again the proposal was on the stationery of Andover-New Jersey and signed by Gero as president of Andover-New Jersey. This revised proposal also differed from the terms sought by Western because, *inter alia,* Realex was only offering $3,750,000; while Western was seeking at least $4,500,000 as mentioned, *supra.* In view of the fact that Western wanted clarification of the April 30 proposal of Realex, Grimaldi arranged a meeting for May 6, 1980, in Realex' New York City offices. Further, Andover-New Jersey reduced its commission, in this second proposal, to 5%. This meeting took place as scheduled. Grimaldi believes that Gero of Andover-New Jersey was among those present. Even though Grimaldi informed the parties that Realex' bid of $3,750,000 was the highest bid yet received, he also stated that there were still a substantial number of issues that remained to be settled before there could be an agreement. According to Grimaldi:

"I made them [Realex] aware, I stressed, that any agreement that we made * * * would still have to be subject to approval by [Western's] board of directors.

"I stressed that they should get somebody to look at the building to examine all these problems, because it meant dollars, my purpose being that I wanted us to start negotiating towards the $5 million from a common ground, not that we negotiate to the 5 million and then they knock me down because of these things that they weren't aware of * * *

"I made them aware that we wanted to be able to have some control of who they leased the properties to if we ever made a deal.

"I told them that they had to control the dumping of chemicals. There had to be some provision where they would control or prohibit the dumping of chemicals by their tenants.

"And we would not make any repairs to the building, that the building was as is, and since they didn't know about it, I again told them you should really have an engineer look at it.

"They became a little bit concerned, and they were grateful that I pointed up all these things, and they were concerned about these items."

Thereafter, on May 9, 1980, a meeting took place in Western's New York City offices between the attorneys for Realex and Western for the purpose of discussing the terms of a possible sales contract. No agreement was ever reached between the parties concerning this property, and, several weeks later, Western withdrew the property from the market.

In September, 1980, plaintiffs Andover-New York and Andover-New Jersey commenced the instant action to recover a brokerage commission from defendant Western concerning the Kearny, New Jersey, property. In substance, plaintiffs alleged in their complaint that they are entitled to a 5% commission, which amounts to $187,500 of the $3,750,000 offer Realex submitted for this property because defendant allegedly accepted that offer, subject only to inconsequential terms to be negotiated. Defendant interposed an answer, which, *inter alia,* denied that defendant had ever accepted the offer and raised the affirmative defense of the New Jersey Statute of Frauds, as it pertains to real estate brokers. This statute is found in title 25 of New Jersey Statutes Annotated and, in pertinent part, it reads: "25:1-9. Commissions of real estate broker or agent; writing required * * * no broker or real estate agent selling or exchanging real estate for or on account of the owner shall be entitled to any commission for such sale or exchange, unless his authority therefor is in writing, signed by the owner or his authorized agent, or unless such authority is recognized in a writing or memorandum, signed by the owner or his authorized agent, either before or after such sale or exchange has been effected, and, in either case, the rate of commission on the dollar or the amount of the commission shall have been stated therein."

In New York, unlike New Jersey, a real estate broker is specifically exempt from the reach of the Statute of Frauds in respect to earning commissions. (New York General Obligations Law, § 5-701, subd 10.)

Defendant moved for summary judgment, based upon the New Jersey Statute of Frauds. As Special Term noted:

"the court is confronted in the first instance with the issue of determining the appropriate choice of law to be applied herein. Should New Jersey law or New York law control this case?" Special Term resolved that issue by finding that New York substantive law should control the action and, therefore, it struck the defendant's defense of the Statute of Frauds as well as denying defendant's motion for summary judgment. We disagree.

Our review of this record leads us to conclude that New Jersey "has the paramount interest in the application of its law when the contacts which New Jersey and this State have with the instant controversy are examined in relation to the policies and purpose to be vindicated by the conflicting laws" (*Intercontinental Planning v Daystrom, Inc.*, 24 NY2d 372, 382).

Herein the subject premises are located in New Jersey. As a general rule "contracts referring to the transfer of title to land are governed by the law of the place where the land is situated" (*Stumpf v Hallahan*, 101 App Div 383, 386, affd 185 NY 550).

Defendant clearly intended that the laws of New Jersey apply in the instant case, since it deliberately sought New Jersey brokers to deal with, as discussed, *supra*. Plaintiffs apparently evidenced their awareness that they were selected by defendant because they were licensed as New Jersey real estate brokers, by presenting the two proposals, to defendant, on Andover-New Jersey stationery, even though Greenwald, Reiss and Realex were located in New York. Significantly, plaintiffs do not offer any evidence to support the conclusion that defendant had any knowledge of the participation of Andover-New York in this matter, and defendant specifically denies having such knowledge. "In formulating rules to govern contractual rights in situations involving conflicts of laws, the courts have often sought to carry out the presumed intention of the parties" (19 NY Jur 2d, Conflict of Laws, § 33, p 608).

In *Ellsworth Dobbs, Inc. v Johnson* (50 NJ 528, 552-553) a unanimous New Jersey Supreme Court set forth the reason for the application, in New Jersey, of the Statute of Frauds to real estate brokers' commissions: "[T]he lawmakers long ago amended the statute of frauds so as to deny

brokers the right to commission on a sale of real property unless their authority from the owner to find a purchaser is given in writing. *N.J.S.A.* 25:1-9. The statutes are a valid exercise of the police power designed as they are to protect the public from fraud, incompetence, misinterpretation, sharp or unconscionable practice."

We hold that, based upon the record herein, none of the following three facts, either singly or in combination, supports a finding that New York's interest outweighs New Jersey's in this matter: (1) that the May 6 and May 9 meetings, mentioned *supra,* were held in New York City; (2) that defendant received inquiries about the property at its New York City office; and, (3) that potential purchasers Greenwald, Reiss and Realex were located in New York.

"It is clear that the instant dispute has sufficient contacts with [New Jersey] to give [New Jersey] a substantial interest in applying its [Statute of Frauds] policy" (*Intercontinental Planning v Daystrom, Inc., supra,* at p 384).

It has long been the law in New York, that the State having the greatest interest in the matter should have its law applied (*Auten v Auten,* 308 NY 155).

Here, the solicitation was made to New Jersey real estate brokers, the property is located in New Jersey, and most of the communications took place in New Jersey. The minimum fortuitous contacts that New York has with this litigation are grossly insufficient to overcome New Jersey's paramount interest herein.

Accordingly, the order of the Supreme Court, New York County (STANLEY PARNESS, J.), entered April 15, 1983 which, *inter alia,* struck the defendant's affirmative defense of the Statute of Frauds and denied defendant's motion and the plaintiffs' cross motion for summary judgment, should be reversed, to the extent appealed from on the law, with costs, the defendant's Statute of Frauds defense reinstated and defendant's motion for summary judgment granted.

SULLIVAN, J. P., ASCH, BLOOM and ALEXANDER, JJ., concur.

Order, Supreme Court, New York County, entered on April 15, 1983, unanimously reversed, on the law, the

defendant's Statute of Frauds defense reinstated and defendant's motion for summary judgment granted. Appellant shall recover of respondents $75 costs and disbursements of this appeal.